John W. Leardi
Nicole P. Allocca
Chris Lobozzo
BUTTACI LEARDI & WERNER LLC
212 Carnegie Center Suite 202
Princeton, New Jersey 08540
609.799.5150
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JOHN D. LIPANI, M.D., as an assignee, authorized representative, and attorney-in-fact of his patient A.T., | : : : : | No.: |
| *Plaintiff,* | : : | **COMPLAINT** |
| - v. - | : : | |
| AETNA LIFE INSURANCE COMPANY, | : : : | |
| *Defendant.* | : : | |

Plaintiff JOHN D. LIPANI, M.D. as an assignee, duly-appointed authorized representative, and attorney-in-fact of his patient A.T., by way of this Complaint against AETNA LIFE INSURANCE COMPANY, hereby alleges upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation made by and through his attorneys, as follows:

## PARTIES

1.      John D. Lipani, M.D. ("Dr. Lipani"), is a board certified, fellowship-trained neurosurgery specialist in brain surgery and spine surgery. Dr. Lipani's neurosurgery specialties include complex and minimally invasive spine surgery and non-invasive brain and spine radiosurgery. Dr. Lipani also specializes in revision spinal surgery including correction of cervical

and lumbar fusion and cervical disc replacement surgery. He is the sole owner and operator of Princeton Neurological Surgery, P.C. ("PNS").

2.      PNS is a New Jersey professional corporation with a principal place of business located at 3836 Quakerbridge Road Suite 203 Hamilton, New Jersey 08619, which owns and operates a neurological surgery practice that specializes in brain tumor treatment, treatment of intracranial conditions, complex brain surgery, brain tumor surgery, complex spine surgery, and minimally invasive surgery.

3.      Aetna Life Insurance Company ("Aetna") is a health insurance company with its corporate headquarters and principal place of business located at 151 Farmington Avenue, Hartford, CT, 06156.

4.      Aetna underwrites and/or administers certain commercial health plans, through which healthcare expenses incurred by insureds for services and/or products covered by the plans are reimbursed by and/or through Aetna, subject to each plan's terms. Accordingly, Aetna is a fiduciary under ERISA.

5.      At all times relevant hereto, A.T. was a "beneficiary," as defined by 29 U.S.C. § 1002 (8), in an "Employee Health Benefit Plan," as defined by 29 U.S.C. § 1002 (1) administered by Aetna, through her Employer Condent Inc. A.T. received health benefits through Aetna Choice POS II (the "Plan").

6.      To the extent the Plan contains an "anti-assignment clause," Dr. Lipani is empowered to act pursuant to an assignment to bring this claim on his own behalf, or alternatively on behalf of A.T., as her authorized representative and attorney-in-fact.

## JURISDICTION AND VENUE

7.      Aetna's actions in administrating the Plan are governed by the Employee

Retirement Income Security Act of 1974, 29 U.S.C. § § 1001 to 1461 ("ERISA"). This Court, therefore, has subject matter jurisdiction over the claim for benefits brought under 29 U.S.C. § 1132(a)(1)(B) herein pursuant to 29 U.S.C. § 1132(e).

8.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

9.      This Court has personal jurisdiction over Aetna because Aetna has substantial contacts with, and regularly conducts business in, New Jersey.

## STANDING

10.     As a beneficiary of the Plan as that term is defined in 29 U.S.C. § 1002(8), A.T., has standing to bring this action under 29 U.S.C. § 1132(a)(1)(B).

11.     By and through an assignment of benefits, A.T. has assigned her right to bring this action to Dr. Lipani, who therefore has standing to bring this action under 29 U.S.C. § 1132(a)(1)(b). The instrument A.T. executed in favor of Dr. Lipani incorporates, *inter alia*, the below language:

> I hereby assign all applicable health insurance benefits to which I and/or my dependents are entitled to [PNS] and/or [Dr. Lipani] . . . I hereby authorize the [PNS] and/or [Dr. Lipani] to submit claims, on my and/or my dependent's behalf, to the benefit plan.

12.     The assignment of benefits and claims also states, in relevant part:

> I hereby designate, authorize, and convey to [PNS] and/or [Dr. Lipani] to the full extent permissible under law and under any applicable insurance policy and/or employee health care benefit plan. . . the right and ability to act as my Authorized Representative in connection with any claim, right or cause in action said that I may have under such insurance policy insurance policy and/or benefit plan.

13.     AT. has also designated Dr. Lipani as her "authorized representative," as defined in 29 C.F.R. § 2560.503-1, and Dr. Lipani may, therefore, bring this action on behalf of A.T. under

29 U.S.C. § 1132(a)(1)(B). The instrument A.T. executed in favor of Dr. Lipani incorporates, *inter alia*, the below language:

> I hereby designate, authorize, and convey to [PNS] and/or [Dr. Lipani] to the full extent permissible under law and under any applicable insurance policy and/or employee health care benefit plan: (1) the right and ability to act as my Authorized Representative in connection with any claim, right, or cause in action that I may have under such insurance policy and/or benefit plan; and (2) the right and ability to act as my Authorized Representative to pursue such claim, right, or cause of action in connection with said insurance policy and/or benefit plan (including but not limited to, the right and ability to act as my Authorized Representative with respect to a benefit plan governed by the provisions of ERISA as provided in 29 *C.F.R.* §2560.5031(b)(4) with respect to any healthcare expense incurred as a result of the services I received from Provider and, to the extent permissible under the law, to claim on my behalf, such benefits, claims, or reimbursement, and any other applicable remedy, including fines.

14.     A.T. also designated Dr. Lipani as her "attorney-in-fact" for purposes of pursuing this claim. The instrument A.T. executed in favor of PNS incorporates, *inter alia*, the below language:

> I hereby designate, authorize, and convey to Provider to conduct insurance transactions and to demand, sue for, collect, recover and receive all goods, claims, debts, monies, and demands whatsoever now or shall hereafter become due, owning or belonging to me (including the right to institute any action, suit or legal proceedings, for the recovery of any claims or any part, or parts, thereof, to the possession whereof I may be entitled), to have and take all means for the recovery thereof, by action at law, suits in equity, or otherwise, and to compromise and agree for the same, and to make, execute and deliver receipts, releases, acquittances or other sufficient discharges therefore, and to sue and to settle suits of any kind in my name or on my behalf. This Power of Attorney extends to the power to conduct litigation and other legal proceedings, including the acceptance of service of process on my behalf, related to any insurance transactions.

> This Power of Attorney includes the power to conduct health care billing, recordkeeping and payment, which authorizes the Provider to act as my representative pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), sections 1171 through 1179 of the Social Security Act, 42 U.S.C. Section 1320d, and applicable regulations, in order to take action including but not limited to obtaining access to my health care information.

Provider shall follow my instructions as set forth in this Assignment of Benefits. The Provider shall not be authorized to make any health care decisions on my behalf. Furthermore, I do not authorize the Provider to: (a) make gifts or gratuitous transfers, including but not limited to gifts or gratuitous transfers of my property to the Provider; or (b) designate, change or revoke the beneficiary designations in any life insurance, annuity, or similar contract, employee benefit or plan or retirement benefit or plan, payable on death or transfer on death account, or any other account or benefit; or (c) make, amend, alter, revoke or terminate any inter vivos trust, registration of my securities in beneficiary form, or any provisions for nonprobate transfer at death or to open, modify or terminate a transfer on death account; or (d) make transfers of property, money or other assets to any trust; or (e)  disclaim property or disclaim a power of appointment or discretion held by me as executor or trustee or in a similar fiduciary capacity; or (f) open or close any account of mine including an account naming the Provider and I as joint owners unless the change in account status is solely ministerial in nature; or (g) create or change rights of survivorship; or (h) renounce my designation as fiduciary for another person; or (i) reject, renounce, disclaim, release, or consent to a reduction in or modification of a share in or payment from an estate, trust or other beneficial interest; or (j) delegate to others any one, more or all of the powers that have been conferred on the Provider.

15.    The Power of Attorney is duly witnessed and notarized, and therefore comports with the New Jersey Revised Durable Power of Attorney Act, N.J.S.A. 46:2B-8.1 to -17 ("RDPAA"). It is attached hereto as Exhibit A (redacted).

## A.T.'S CLAIM FOR BENEFITS

**A.    A.T.'s Emergency Surgery.**

16.    On February 11, 2021, A.T. presented to the Capital Health Regional Medical Center emergency room with a longstanding history of neck pain and immediate symptoms of debilitating pain.

17.    Dr. Kyle Wasserman, the emergency room attending physician, diagnosed numbness, weakness, and radiculopathy of the upper right extremity.

18.     Based on this diagnosis, on February 12, 2021, A.T. was admitted for emergency surgery.

5

19.     Dr. Sandro LaRocca was the primary surgeon. Dr. Lipani was the assistant surgeon.

20.     Upon admission to the operating room, A.T. was given appropriate prophylactic antibiotics and underwent general anesthesia with endotracheal intubation without incident.

21.     Baseline neurophysiologic indices were obtained and the neck was prepped and draped in a sterile fashion, where a radiopaque marker was placed to the localizing incision using lateral C-arm imaging.

22.     An incision approximately 1-inch in length was made over the cricoid ring extending from the midline, lateral to the left. The incision was taken to the playsmal layer which was divided in line with the incisions. Blunt dissection was used to penetrate down to the spine in between the trachea and the carotid.

23.      Peanut elevators were used to penetrate and elevate the paracervical fascia down to the underlying anterior longitudinal ligaments and the disk spaces at what was thought to be C6-7. A curved spinal needle was placed.

24.     Lateral C-arm imaging revealed an accurate position. Based on this, exposure was completed both cephalad and caudad. Self-retaining retractors were obtained and the longus colli was elevated laterally and bilaterally to facilitate exposure. Initially, a self-retaining retractor was placed spanning C6-7. Vertebral spreader pins were placed in the bodies of C6 and C7.

25.     At this point, an annulotomy was performed using a #15 blade, and a thorough diskectomy was taken down to bleeding subchondral bone using a combination of pituitary rongeurs and various curettes. This was taken down to the posterior longitudinal ligament which was gently penetrated using a blunt nerve hook in the foramen that was removed in a piece-wise fashion.

26.     On A.T.'s right-hand side, there was a disk fragment removed from the foramen.

The foramen was deemed decompressed when an arthroscopic nerve hook was passed into the foramen and then manipulated without difficulty. A similar approach was taken on the contralateral side.

27.     Next, the endplates were fenestrated using a Stedman chondral pick as well as a high-speed drill, and an appropriate size PEEK interbody spacer was selected, packed with silicated calcium phosphate, and impacted into place.

28.     The vertebral spreader pin was then removed from C7 and placed at C5 centrally in the vertebral body. In a similar fashion, a thorough diskectomy was performed to bleeding subchondral bones. Foraminotomies were performed. The foramina were decompressed. Endplates were fenestrated.

29.     The appropriate cage size was selected, packed with silicated calcium phosphate, and impacted into place. An appropriate size plate was applied and provisionally fixed. Screws were placed in the vertebral bodies at CS, and C6, and C7 in appropriate trajectories. Excellent fixation was obtained. AP and lateral imaging revealed good placement of all instrumentation.

30.     The locking neck mechanisms were engaged, and the wound was thoroughly irrigated with normal saline on multiple occasions. Hemostasis was obtained.

31.     The platysmal layer was closed using #2-0 Vicryl in an intermittent fashion. The skin was closed using #2-0 Vicryl in an inverted fashion. The skin was subsequently closed using #3-0 Monocryl in a running subcuticular fashion. Dermabond was applied as was a hard cervical collar. The foley catheter was removed. The patient was extubated and transferred to the Recovery Room in stable condition.

**B.    The Plan's Terms.**

32.     The Plan and insurance card both confirm that Aetna is the claims administrator.[1]

33.     The Plan explains that the claims administrator may, "in its discretion, interpret and apply the terms of the Plan regarding benefit payment and to make findings of fact. This includes determining whether individuals are entitled to benefits under the Plan and calculating benefit payments."[2]

34.     By the terms of the Plan, out of network ("ONET") emergency services;

[W]ill pay an amount equal to the greatest of the following (adjusted for in-network cost-sharing requirements):
- The amount negotiated with in-network providers for the emergency service furnished,
- The reasonable and customary amount for the emergency service furnished, and
- The amount that Medicare would pay for the emergency service, excluding any in-network copayment or coinsurance imposed.[3]

35.     The Plan defines reasonable and customary as "[t]he usual charge of most providers of similar training and experience in the same or similar geographic area for the same or similar medical service or supplies."[4]

36.     The Plan also acknowledges ERISA's characterization of an "Urgent Care Claim" as a claim which if the regular time periods for handling such a claim would, "seriously jeopardize … life or health ... or ability to regain maximum function, or [w]ould in the opinion of a professional provider with knowledge of [the patient's] condition [result in] severe pain that could not be adequately managed without the care or treatment that is the subject of the claim."[5]

**C.     Submission and Denial of Claim for Benefits.**

37.     On February 9, 2021, Aetna employee "Sam V." represented to PNS that the Plan

---

[1] Conduent Health and Welfare Benefit Program pg. 264.
[2] Conduent Health and Welfare Benefit Program pg. 10.
[3] Conduent Health and Welfare Benefit Program pg. 36.
[4] Conduent Health and Welfare Benefit Program pg. 221.
[5] Conduent Health and Welfare Benefit Program pg. 269.

paid 200% of Medicare. This representation is consistent with the Plan document that details ONET urgent care.

38.     On February 10, 2021, Aetna faxed, and PNS received, an authorization for the planned procedure.

39.     Pursuant to A.T.'s assignment of benefits to Dr. Lipani executed prior to the procedure, PNS promptly electronically submitted a Health Insurance Claim Form (the "Claim"), to Aetna on February 16, 2021.

40.     The Claim was submitted with the following CPT codes and modifiers;

| CPT (Modifiers) | Billed Amount |
|---|---|
| 22551 (80, ET) | $96,634.00 |
| 22552 (80, ET) | $65,500.00 |
| 22853 x2 (80, ET) | $99,000.00 |
| 22845 (80, 59, ET) | $39,781.00 |
| 20930 (80, ET) | $3,800.00 |
| **Total** | **$304,715.00** |

41.     On February 22, 2021, Aetna denied payment on the Claim entirely. This sent PNS on an arduous journey to receive a rational explanation for this choice. The initial decision was reflected in an Explanation of Benefits ("EOB") mailed to PNS by Aetna, reflecting the following;

| CPT (Modifiers) | Billed Amount | Paid Amount |
|---|---|---|
| 22551 (80, ET) | $96,634.00 | $0.00 |
| 22552 (80, ET) | $65,500.00 | $0.00 |
| 22853 x2 (80, ET) | $99,000.00 | $0.00 |
| 22845 (80, 59, ET) | $39,781.00 | $0.00 |
| 20930 (80, ET) | $3,800.00 | $0.00 |
| **Total** | **$304,715.00** | **$0.00** |

42.     The EOB listed the follow boilerplate explanations as justifications for the denial:

a. "Add-on" codes describe procedures/services that are always

performed in addition to the primary procedure/service and must be listed in addition to the main CPT code. This service is not reimbursed as the appropriate primary procedure/service is missing of has been denied.

b.  Member's plan allows up to 200% of the Medicare Allowable Rate for charges covered by their plan.

c. The member's plan provides coverage for charges that are reasonable and appropriate. This charge is for a service that is considered incidental to another service.

d. Your claim has been separated to expedite handling. You will receive a separate notice for the other services reported.

43.    In response to the denial, on February 22, 2021, PNS mailed Aetna additional documentation to illustrate that the procedure was in fact an emergency. PNS identified that as indicated in the EOB, Aetna had electively split the CPT codes, and then insisted that codes were lacking the qualifying procedure.

44.    PNS called Aetna on several times to no avail, when on March 1, 2021, Aetna representative, "Shane C.", explained that the Claim was incorrectly processed as an elective procedure, when it should have been processed as an emergency procedure. Shane C. went to explain that the Claim was going to be reprocessed as an emergency claim.

**C.    Practitioner and Member Appeals.**

45.    On March 9, 2021, PNS completed and submitted a Practitioner and Provider Complaint and Appeal Request ("Practitioner Appeal"). In this appeal, PNS explained that Aetna's initial choice to "split" the Claim had resulted in separating CPT 22551 "to expedite processing" resulted in their improper denial of add-on codes 22853 and 22522 because they were lacking the "qualifying procedure."

46.    The Practitioner Appeal explained to Aetna that by improperly processing the Claim, it left the member with a balance of $60,943.00. Had Aetna not separated CPT 22551, and processed the Claim appropriately, it would have reduced the billed amount with the listed

modifiers. Accordingly, the outstanding balance is reflected the chart below:

| CPT (Modifiers) | Billed Amount | Paid Amount | Outstanding Balance |
|---|---|---|---|
| 22551 (80, ET) | $96,634.00 | $0.00 | $19,326.00 |
| 22552 (80, ET) | $65,500.00 | $0.00 | $13,100.00 |
| 22853 x2 (80, ET) | $99,000.00 | $0.00 | $19,800.00 |
| 22845 (80, 59, ET) | $39,781.00 | $0.00 | $7,956.20 |
| 20930 (80, ET) | $3,800.00 | $0.00 | $760.00 |
| **Total** | **$304,715.00** | **$0.00** | **$60,943.00** |

47.     On the same day, PNS submitted a request for ONET negotiation, which Aetna confirmed receipt of.

48.     On March 11, 2021, Aetna sent a letter to PNS indicating that their review of the Claim was paid accurately. Again, no further reasoning or information was provided.

49.     Following up on the previous confusion, PNS contacted Aetna again on March 15, 19, and 23, 2021. On March 23, "Alma M." provided an additional Level 1 Appeal Form and explained that the March 11 letter was in response to the March 9 request for ONET negotiation and was incorrectly processed and has since been reopened.

50.     On April 1, 2021, PNS received a letter from Aetna stating that the request for payment of the Claim has reached the final level of appeal, further explaining that CPT 22853 will be allowed, however, it will not issue payment as the Claim.

51.     In April 2021, PNS contacted Aetna **ten** times, which yielded representations from Aetna so varied that extracting a coherent position is futile. Aetna agents represented to PNS that:

- the Claim was split into 5 segments and still processing;

- there was a determination on the Claim on April 6;

- the appeal needs to be resubmitted in spite of two prior notices that the review was

final;

- the Plan being based in Connecticut resulted in improper analysis on the part of Aetna;

- acknowledged receipt of the new appeal;

- denied the existence and or necessity of the new appeal.

52.    On May 3, 2021, PNS received another letter from Aetna explaining that it had already engaged in a full and final investigation and reaffirmed that its previous decisions were final.

53.    On July 8, 2021, Aetna responded to the member appeal and provided an explanation for the denial;

> [C]ode 20930-80 is not eligible for payment. The service is incidental to the total episode of care. Codes 20930 and 20936 are add-on codes that represent an allograft and autograft for spinal surgery only. CMS assigns a status code of V for both codes which states that payment for covered services are always bundled into payment for other services not specified. Codes 20930 and 20936 will be disallowed when billed in conjunction with another CPT and/or HCPCS procedure code. Modifier 59 will not be allowed to override these edits. Therefore, separate charges for these services do not meet criteria for separate payment.

54.    After receiving  Aetna's denial of the member appeal, A.T. called Aetna on August 12, 23, 25, and 26, 2021. These calls yielded no meaningful response from Aetna.

55.    On August 24, 2021, A.T. wrote to Aetna, requesting a review of the Claim again, and faxed a formal request for ONET review. This again yielded no further response from Aetna.

56.    On November 16, 2021, PNS requested that Aetna submit the disputed Claim to review by an Independent Medical Reviewer.

57.    On November 18, 2021, Aetna responded to PNS' review request with Orwellian doublespeak, stating that this Claim was not eligible for the Federal Department of Labor External Review process because it is "claims processing dispute" as opposed to a denial "based on medical

necessity." This absurd statement fails to apply the rational context of the matter being a Claim, whose processing is being disputed, based on Aetna's application of the phrase "medical necessity."

### D.   Arbitration.

58.    On July 9, 2021, PNS submitted a request for an arbitration to the New Jersey Division of Banking and Insurance ("DOBI").

59.    On July 19, 2021, Maximus Federal ("Maxims"), a third party contracted with DOBI to administer arbitration applications, acknowledged receipt of PNS' application, and expressed that the Claim was eligible for review.

60.    On October 4, Maximus determined that $42,107.20 is a reasonable amount of reimbursement based on the service provided surrounding the Claim.

61.    More specifically, in its non-binding recommendation, Maximus determined that this amount would alleviate the member of being balanced billed by the Provider for emergency services.

62.    After receiving the Maximus determination, PNS again reached out to Aetna. Specifically, on October 12, PNS submitted another Practitioner and Provider Complaint and Appeal Request updated with arbitrator's findings. Aetna did not respond to this request.

### E.   Exhaustion of Remedies

63.    Any administrative remedies that may be required to be pursued under ERISA have been exhausted, should be deemed exhausted under applicable regulations, or would be futile under the circumstances, and are therefore excused.

64.    Aetna's denial of benefits was contrary to the terms and conditions of the Plan, including but not limited to the provisions regarding payment for ONET emergency services and

the classification of urgent care.

65.     Aetna's misapplication of the Plan terms is further evidenced by Maximus' clear independent arbitration analysis.

66.     Because Aetna failed to pay the Claim here in issue within the time frames set forth in 29 C.F.R. § 2560.503-1, PNS and Dr. Lipani are permitted to immediately pursue remedies available under 29 U.S.C. § 1132 on behalf of A.T.

## FIRST COUNT
### (Claim for Plan Benefits Under 29 U.S.C. § 1132(a)(1)(B))

67.     PNS and Dr. Lipani repeat and re-allege each and every allegation contained in Paragraphs 1 to 66 of the Complaint as if set forth at length herein.

68.     By failing to pay benefits to Dr. Lipani for services provided to A.T., Aetna violated obligations set forth in the Plan, and such denials were arbitrary, capricious, and manifestly mistaken.

69.     Because A.T. was a beneficiary the Plan, and because Dr. Lipani is A.T.'s assignee, authorized representative, and/or attorney-in-fact with respect to the benefit claims here in issue, Dr. Lipani has standing to bring this cause of action under 29 U.S.C. § 1132(a)(1)(B) to enforce rights created by the Plan and to seek benefits relating to services provided by Dr. Lipani to A.T.

**WHEREFORE,** Plaintiff, Dr. Lipani, as the assignee, authorized representative, and/or the attorney-in-fact of A.T., demands judgment against Defendant Aetna, as follows: (a) declaring that Defendant Aetna violated its duties and obligations under the Plan by failing to pay benefits relating to the services provided by Dr. Lipani to A.T.; (b) directing Defendant Aetna to pay benefits to Dr. Lipani relating to the services provided to A.T.; (c) prejudgment interest; (d) attorney's fees pursuant to 29 U.S.C. § 1132(g)(1); (e) costs pursuant to 29 U.S.C. § 1132(g)(1); and (f) such other and further relief as the Court may deem equitable and just.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

I hereby certify that the above-captioned matter is not subject to compulsory arbitration in that the Plaintiff seeks declaratory relief in that Defendant Aetna violated its duties and obligations under the Plan by failing to pay benefits relating to the services provided by Dr. Lipani to A.T.

### CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1

I hereby certify that, to the best of my knowledge, the matter in controversy is not the subject of any other pending or anticipated litigation in any court or arbitration proceeding, nor are there any non-parties known to Plaintiff that should be joined to this action. In addition, I recognize a continuing obligation during this litigation to file and to serve on all other parties and with the Court an amended certification if there is a change in the facts stated in this original certification.


DATED: May 4, 2022                              Respectfully submitted,

                                                 /s/ Christopher G. Lobozzo
                                                Christopher G.  Lobozzo
                                                BUTTACI LEARDI & WERNER LLC
                                                212 Carnegie Center, Suite 202
                                                Princeton, New Jersey 08540
                                                609-799-5150
                                                *Attorneys for Plaintiff*

Exhibit A

## ASSIGNMENT OF BENEFITS / ERISA AUTHORIZED REPRESENTATIVE LIMITED POWER OF ATTORNEY

### FINANCIAL RESPONSIBILITY

I have requested professional services from Princeton Neurological Surgery, P.C. ("Practice") and/or Dr. John Lipani ("Provider") on behalf of myself and/or my dependents, and understand that by making this request, I am responsible for all charges incurred during said services. I understand that all fees for said services are due and payable on the date services are rendered and agree to pay all such charges incurred in full immediately upon presentation of the appropriate statement unless other arrangements have been made in advance.

### ASSIGNMENT OF INSURANCE BENEFITS

I hereby assign all applicable health insurance benefits to which I and/or my dependents are entitled to Practice and/or Provider. I certify that the health insurance information that I provided to Practice and/or Provider is accurate as of the date set forth below and that I am responsible for keeping it updated.

I hereby authorize Practice and/or Provider to submit claims, on my and/or my dependent's behalf, to the benefit plan (or its administrator) listed on the current insurance card I provided to Practice and/or Provider, in good faith. I also hereby instruct my benefit plan (or its administrator) to pay Practice and/or Provider directly for services rendered to me or my dependents. To the extent that my current policy prohibits direct payment to Practice and/or Provider, I hereby instruct and direct my benefit plan (or its administrator) to provide documentation stating such non-assignment to myself and Practice and/or Provider upon request. Upon proof of such non-assignment, I instruct my benefit plan (or its administrator) to make out the check to me and mail it directly to Practice and/or Provider.

I am fully aware that having health insurance does not absolve me of my responsibility to ensure that my bills for professional services from Practice and/or Provider are paid in full. I also understand that I am responsible for all amounts not covered by my health insurance, including co-payments, co-insurance, and deductibles.

### AUTHORIZATION TO RELEASE INFORMATION

I hereby authorize Practice and/or Provider to: (1) release any information necessary to my health benefit plan (or its administrator) regarding my illness and treatments; (2) process insurance claims generated during examination or treatment; and (3) allow a photocopy of my signature to be used to process insurance claims. This order will remain in effect until revoked by me in writing.

### ERISA AUTHORIZATION

I hereby designate, authorize, and convey to Practice and/or Provider to the full extent permissible under law and under any applicable insurance policy and/or employee health care benefit plan: (1) the right and ability to act as my Authorized Representative in connection with any claim, right,

or cause in action that I may have under such insurance policy and/or benefit plan; and (2) the right and ability to act as my Authorized Representative to pursue such claim, right, or cause of action in connection with said insurance policy and/or benefit plan (including but not limited to, the right and ability to act as my Authorized Representative with respect to a benefit plan governed by the provisions of ERISA as provided in 29 *C.F.R.* §2560.5031(b)(4) with respect to any healthcare expense incurred as a result of the services I received from Provider and, to the extent permissible under the law, to claim on my behalf, such benefits, claims, or reimbursement, and any other applicable remedy, including fines.

## POWER OF ATTORNEY

I hereby designate, authorize, and convey to Provider to conduct insurance transactions and to demand, sue for, collect, recover and receive all goods, claims, debts, monies, and demands whatsoever now or shall hereafter become due, owning or belonging to me (including the right to institute any action, suit or legal proceedings, for the recovery of any claims or any part, or parts, thereof, to the possession whereof I may be entitled), to have and take all means for the recovery thereof, by action at law, suits in equity, or otherwise, and to compromise and agree for the same, and to make, execute and deliver receipts, releases, acquittances or other sufficient discharges therefore, and to sue and to settle suits of any kind in my name or on my behalf. This Power of Attorney extends to the power to conduct litigation and other legal proceedings, including the acceptance of service of process on my behalf, related to any insurance transactions.

This Power of Attorney includes the power to conduct health care billing, recordkeeping and payment, which authorizes the Provider to act as my representative pursuant to the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), sections 1171 through 1179 of the Social Security Act, 42 U.S.C. Section 1320d, and applicable regulations, in order to take action including but not limited to obtaining access to my health care information and to communicate with my health care provider.

Provider shall follow my instructions as set forth in this Assignment of Benefits. The Provider shall not be authorized to make any health care decisions on my behalf. Furthermore, I do not authorize the Provider to: (a) make gifts or gratuitous transfers, including but not limited to gifts or gratuitous transfers of my property to the Provider; or (b) designate, change or revoke the beneficiary designations in any life insurance, annuity, or similar contract, employee benefit or plan or retirement benefit or plan, payable on death or transfer on death account, or any other account or benefit; or (c) make, amend, alter, revoke or terminate any inter vivos trust, registration of my securities in beneficiary form, or any provisions for nonprobate transfer at death or to open, modify or terminate a transfer on death account; or (d) make transfers of property, money or other assets to any trust; or (e) disclaim property or disclaim a power of appointment or discretion held by me as executor or trustee or in a similar fiduciary capacity; or (f) open or close any account of mine including an account naming the Provider and I as joint owners unless the change in account status is solely ministerial in nature; or (g) create or change rights of survivorship; or (h) renounce my designation as fiduciary for another person; or (i) reject, renounce, disclaim, release, or consent to a reduction in or modification of a share in or payment from an estate, trust or other beneficial interest; or (j) delegate to others any one, more or all of the powers that have been conferred on the Provider.

Page **2** of 4

This Power of Attorney will continue to be effective if I become disabled, incapacitated, or incompetent; or die. This Power of Attorney is not affected by lapse of time. A photocopy or electronically transmitted copy of this Assignment/Authorization shall be as effective and valid as the original.

**SIGNATURES**

_____
Patient Signature

_____ 12 | 22 | 21
Date

_____
Policyholder/Insured Signature

_____ 12 | 22 | 21
Date

_____
Provider Signature

_____ 12/22/21
Date

**WITNESSES**

IN WITNESS WHEREOF, I have hereunto set my hand and seal the _____ day of, 20____.
Signed, sealed, and delivered in the presence of:

_____
Witness 1 Signature

_____ 12/22/2021
Date

_____
Print 1 Witness Name

_____
Witness 2 Signature

_____ 10-22-2021
Date

_____
Print 2 Witness Name

Page **3** of **4**

**NOTARY**[1]

State of New Jersey

County of ⎍⎍⎍⎍⎍ ,

On ⎍⎍ ⎍⎍ , 20⎍⎍ before me ⎍⎍⎍⎍⎍⎍⎍ , Notary Public in and for said county, appeared ⎍⎍⎍⎍⎍⎍⎍ , [signer/witness(es)] who [has/have] satisfactorily identified [him/her/themselves] as the [signer/witness(es)] to the above referenced Assignment/Authorization.

(Affix Notary Stamp Here)

⎍⎍⎍⎍⎍⎍⎍⎍

Notary Public Signature

My Commission Expires: ⎍⎍⎍⎍⎍⎍

.HI-KEEYA T. HUNT
Notary Public
State of New Jersey
Commission Expires Mar. 23, 2022
I.D.# 50056891

**CHI-KEEYA T. HUNT**
Notary Public
State of New Jersey
My Commission Expires Mar 2:
I.D.# 50056891

[1] Pursuant to New Jersey Assembly Bill 3903, a New Jersey notary public, or an officer authorized in New Jersey to take oaths and acknowledgments—including but not limited to a New Jersey licensed attorney—may notarize this Power of Attorney so long as (a) New Jersey Executive Order 103 remains in effect for the duration of the COVID-19 public health emergency; (b) the notary or officer is able to communicate with the individual electronically in real time with sight and sound capabilities, including but not limited to videoconferencing web applications or app-based such as Zoom, WebEx, or Facetime; (c) the notary or officer records the signing and maintains this recording for a period of ten (10) years; (d) the notary or officer has either personal knowledge of the individual's identity or satisfactory evidence of the individual's identity from a verifiable source, such as a driver's license, passport, government issued identification, or other form of identification issued by a verifiable third party; (e) the notary or officer can reasonably confirm that the document before the notary or officer is the same document the signee signed; and (f) the notary or officer includes a special annotation that the document was signed using "communication technology."